■ Thomas Gass, Respondent, v Susan Gass, Appellant. [840 NYS2d 58]—

Order, Supreme Court, New York County (Jacqueline W. Silbermann, J.), entered August 3, 2005, which, inter alia, denied defendant's motion to vacate a default judgment, reversed, on the law, the facts and in the exercise of discretion, without costs, and the motion granted with leave to file a late answer within 20 days of service of a copy of this order with notice of entry.

Initially, we find that the motion court properly confirmed the Referee's report, which clearly defined and addressed the issues raised, resolved matters of credibility, and made findings substantiated by the record (see Melnitzky v Uribe, 33 AD3d 373 [2006]). Plaintiff husband proved by a preponderance of the evidence, after a traverse hearing, that his attorney had properly served the wife with a copy of the summons with notice in this divorce action (see Lattingtown Harbor Prop. Owners Assn., Inc. v Agostino, 34 AD3d 536, 538 [2006] [declining to disturb hearing court's finding, supported by the record, that process server was more credible than defendant]).

The dissenting Justice accurately relates the facts, but erroneously rejects the credibility determinations made by the Referee and confirmed by the motion court. Contrary to the dissent's assertion, neither the court nor the Referee based its credibility findings primarily on the process server's status as an attorney. Instead, the record shows that the Referee made explicit credibility findings for each of the three critical wit-

nesses at the traverse hearing—the wife, the process server/attorney and Ms. Lee—and did so based on an evaluation of the traditional criteria for weighing the credibility of witness testimony.

For instance, the Referee found that the wife's testimony was "not credible" based on her obvious motive to deny being served with process (see PJI3d 1:8 [in weighing testimony, jurors may consider the interest or lack of interest of any witness in the outcome of the case]), and further noted that the wife's two strongest pieces of evidence at the traverse hearing—the ATM receipt mentioned by the majority and Lee's testimony—were both "inconclusive" regarding the pivotal issue of whether service was accomplished.

Similarly, the Referee found Lee's testimony "suspect," asking rhetorically, "How likely is it that she would independently remember whether defendant was a customer at the Laundromat on a particular night, months before the traverse hearing?" It was perfectly appropriate for the Referee and the motion court to consider the probability or improbability of Lee's testimony, when considered in light of all the other evidence in the case (see PJI3d 1:8). In fact, the absurdity of Lee's testimony that she remembered the exact date and time of the wife's appearance at her laundromat six months earlier alone justifies this credibility determination made by the Referee.

Nor did the Referee and motion court rely "decisively" on the process server's status as an attorney. Although the Referee certainly did question why "an attorney admitted to practice for over 30 years" would risk his law license by filing a perjurious affidavit of service, the dissent ignores the remainder of the Referee's statement, which points out that engaging in such a desperate falsehood to accomplish service on that particular evening would have been illogical and completely unnecessary, given that the attorney was personally familiar with the wife, lived in close proximity to her, and there was no imminent risk that the statute of limitations would expire if service had not immediately been effected.

In our view, the Referee's statements merely reflect an inquiry into the absence of logical reasons, given the potential risks, of engaging in such misconduct. We agree with his conclusion that the attorney had no discernible motive or logical reason to state falsely that he had properly served the wife, whom he knew personally and who would obviously deny service, since he easily could have accomplished the same result on another occasion.

Nevertheless, under the unique circumstances of this case,

the order should be reversed and the default vacated because, apparently unbeknownst to the Referee who granted the default, the wife had appeared and filed a motion seeking affirmative relief in Supreme Court prior to the default being entered.

Although the wife's default in failing to timely answer the complaint is undisputed, the record amply demonstrates that she undertook several actions that should have placed both the court and the husband's counsel on notice that she intended to appear and defend the matrimonial action. First, on September 27, 2004, after allegedly learning of the divorce action for the first time during an appearance in Family Court, the wife served a notice of appearance (which included a demand for a copy of the divorce complaint and all other papers) and a request for judicial intervention on the husband's attorney by regular mail. Significantly, a copy of the wife's notice of appearance in the record includes a stamp stating "RECEIVED OCT 1—2004 TRIAL SUPPORT OFFICE." This indicates that Supreme Court, or at least the Trial Support Office of that court, received notice that the wife was appearing in the action on October 1, 2004, which is 11 days before the default judgment was signed.

Second, the record also shows that the husband's attorney received the wife's notice of appearance, as evidenced by his September 30, 2004 "Notice of Rejection," wherein he rejected service of the wife's papers as untimely. The notice of rejection further indicates by stamp that it was received by the Trial Support Office on September 30, 2004, 13 days before the default judgment was signed. These documents indicate that the husband's attorney was obviously aware of the wife's appearance in the action 12 days before the default judgment was signed.

In addition, the record shows that on October 6, 2004, the wife submitted a show cause order to vacate the husband's note of issue in the divorce action. Justice Stackhouse signed the order on October 8, and set a return date of October 18. Thus, four days before the default judgment was signed, the record shows that the wife had made a motion in Supreme Court seeking affirmative relief in the divorce action.

From these facts, it is evident that the court and the husband's attorney were or should have been aware of the wife's appearance and her request for affirmative relief several days before the default was signed. However, the papers filed by the husband's counsel in support of the default judgment, as well as the judgment itself, strongly indicate that this information was never brought to the attention of the Referee who granted the default. Indeed, the husband's attorney's affirmation of regular-

ity states that "[the wife] is in default for failure to serve a notice of appearance in this action in due time, and the time to answer has not been extended by stipulation, court order or otherwise." Further, the divorce judgment itself states that "Defendant has not appeared and is in default."

Although we recognize that the husband's papers in support of the default were prepared and filed before the wife's entry into the case, it remains a mystery to us why the Referee was apparently oblivious to her appearance. Equally puzzling is how a Referee can grant a default judgment in an "uncontested" matrimonial action at the same time a Supreme Court Justice has signed a show cause order, brought by the party allegedly in default, requesting vacatur of the note of issue in that action. If the Referee had been made aware of the wife's entry into the case, it is entirely possible that this default never would have been entered.

We note that in recognition of the important public policy of determining matrimonial actions on the merits, the courts of this State have adopted a liberal policy with respect to vacating defaults in actions for divorce or ancillary relief (see Viner v Viner, 291 AD2d 398 [2002]; O'Brien v O'Brien, 149 AD2d 830, 831 [1989]). Accordingly, even assuming that the wife's allegations of a reasonable excuse and meritorious defense were insufficient by themselves to justify the standard for vacatur, under the unusual circumstances of this case, including the wife's pro se status and the fact that the Referee was apparently kept in the dark about her appearance in the case and intent to defend the action, we find that the motion court abused its discretion in refusing to vacate the default (id. at 831-832). We also note that the wife faithfully appeared during all Family Court proceedings and during her prior divorce action, and her motion to vacate her default was made promptly upon its entry.

Finally, our dissenting colleague is mistaken in suggesting that we implicitly find that the wife had perjured herself and suborned perjury. We find no such thing. As our opinion makes clear, we find that the Referee's credibility determinations were supported by the evidence at the traverse hearing, and, to that extent, his finding of proper service must be upheld. Unlike the dissent, we do not believe it is this Court's function to make an independent determination as to who, in fact, perjured themselves at the traverse hearing, and we offer no opinion thereon. Our vacatur ruling is based solely on the unfairness of granting a premature default against an unrepresented party in a matrimonial action. It has nothing to do with indulging any party's alleged misconduct. Concur—Williams, Gonzalez, Sweeny and Kavanagh, JJ.

Sullivan, J.P., dissents in a memorandum as follows: Contrary to the majority's view, this appeal from the denial of defendant wife's motion to vacate a default judgment of divorce turns solely on the motion court's confirmation of a Referee's report, after a traverse hearing, to the extent it determined that the wife had been personally served with a copy of the summons with notice, as indicated in the affidavit of service.[1] Since I believe that the Referee, as a matter of law, improperly assessed the credibility of the process server, who happened to be the husband's attorney, I dissent and would reverse the Referee's factual determination and grant defendant's motion to vacate the default and dismiss the complaint for lack of personal jurisdiction.

Before turning to the facts adduced at the traverse, some background leading to the challenged service of process is in order. The parties, married in 1987, have one child, a son, born in 1990. An incident in June 2003, in which the wife allegedly, in anger and in the husband's presence, punched the child about the face and body and threw a chair at him, brought the parties to Family Court, which issued a temporary order of protection pursuant to article 8 of the Family Court Act in favor of the child and the husband. After a hearing, Family Court extended the order of protection and appointed a law guardian for the child. On August 6, 2003, the husband filed a custody petition and, following a hearing held that day, was granted custody of the child with continuation of the order of protection.

The wife thereafter commenced a divorce action in Supreme Court, New York County, seeking, inter alia, custody of the child, which prompted a transfer of the family offense and custody petitions to the Supreme Court for merger with the divorce action. A law guardian appointed for the child recommended that custody remain with the father. At a settlement conference with the Justice presiding, the wife discontinued her divorce action. The husband commenced the instant divorce action the same day—August 3, 2004—by filing a summons with notice with the New York County Clerk. That night, the husband's attorney allegedly personally served a copy of the summons and notice, together with a copy of the Child Support Standards Act, upon the wife as she was walking near her Prince Street apartment in SoHo. The attorney filed an affidavit of service with the New York County Clerk on August 4. The wife never appeared in her husband's divorce action.

The wife claims she first heard of the new divorce action on

1. The Referee's recommendation regarding the ultimate disposition of the wife's motion was stricken as beyond the scope of the order of reference.

September 27, 2004, during a Family Court support hearing. On the same date, she filed a request for judicial intervention (RJI) with a request for a preliminary conference, and on October 6, 2004 she filed a show cause order to vacate the husband's note of issue in this matter. On October 12, prior to the return date, a judgment of divorce was granted on default on the basis of the wife's cruel and inhuman treatment of her husband. The judgment also awarded custody of the child. According to the wife, the Referee who signed the judgment was unaware of the pending RJI and order to show cause.

On November 17, 2004, the wife moved to vacate the default judgment solely on the ground of lack of jurisdiction due to lack of service. She asserted that she never encountered the husband's attorney, whom she knew, on the date of the alleged service; nor was she served with a copy of the summons with notice. The court directed a traverse hearing before a Special Referee, which was held on February 16, 2005.

The husband's attorney, licensed to practice for 30 years, testified that he resides on Grand Street, on Manhattan's Lower East Side, and that on the evening of August 3, 2004, at approximately 9:00 P.M., he left his apartment to walk 1½ miles to the wife's apartment on Prince Street to serve her with a summons with notice. The attorney, a good friend of plaintiff, had known his client's wife socially for at least 10 years. In fact, he had attended various family functions, including their son's bar mitzvah. On the night in question, he observed the wife at the intersection of Prince and Wooster Streets, and handed her the summons with notice, stating, "Susan, I have a summons for you, along with the Standards of Child Support." According to the attorney, he asked the wife if she were in the armed forces of the United States, to which she responded, "Why are you asking that stupid question?" The attorney noted that he and the wife were standing in front of a store, "Camper Shoes," located at 125 Prince Street, and that the time was approximately 9:45 P.M.

After completing the service, the attorney returned home by taxicab, arriving by 10:00 P.M., and immediately prepared an affidavit of service, as well as a diary entry noting the service. The affidavit of service, notarized and filed with the County Clerk the next day, reflected an August 3, 2004 service at 9:45 P.M. in front of 125 Prince Street. The attorney identified the wife as the person he had served at the time and place in question.

The wife testified that she knew the attorney socially and

that she resided in an apartment at an address on Prince Street,[2] and was employed by J.P. Morgan Chase, with duties that included "computer information security." She stated that on the night in question, she left her apartment at "about 9 P.M." to bring her laundry to Kim's Laundromat, located approximately three blocks away at 207 Thompson Street, just north of Bleecker Street. After loading the washing machines, she left the laundromat to walk two blocks to a Citibank ATM machine located on LaGuardia Place, between Bleecker and West 3rd Streets, completed a transaction and walked directly back to the laundromat. She produced her ATM receipt showing a completed transaction at 9:35 P.M. She denied being at the intersection of Prince and Wooster Streets and having been served with a copy of the summons with notice. She also noted that her apartment was located approximately 3½ blocks away from the corner of Prince and Wooster Streets. The wife finished her laundry at about 10:00 P.M. and was assisted by "Antonio," a laundromat employee, in carrying several loads of laundry back to her apartment. On cross-examination, she stated that it would take "maybe about ten minutes" to walk the 3½ blocks from the Citibank ATM to the corner of Prince and Wooster Streets.

Hae Jung Lee, who worked at the laundromat, recalled the evening in question and confirmed that the wife arrived there "a little after nine o'clock in the evening." As she recalled, "After [the wife] put everything inside the machine, she said, 'I will go out, come back soon,' and she went out." According to Lee, a wash cycle takes 24 minutes. She estimated the wife's absence at "[a]bout ten minutes." She testified that after the wife returned, she finished her wash and left the laundromat a little after 10:30 P.M.

In his report, the Referee found that the husband met his burden to show, by a preponderance of the evidence, that the attorney had served the wife, finding him

"the most credible witness. His testimony had a ring of truthfulness to it. Why would he, an attorney admitted to practice for over 30 years, risk his license by filing a perjurous affidavit of service? Moreover, he knew defendant personally for over a decade and knew where she lived, which was within walking distance of his home. If he had not run into her on the night in question, he could have served her at some other time, there being no statute of limitations problem. His testimony concerning defendant's response to his query about whether she was in the armed forces of the United States, to which she responded, 'Why are you asking that stupid question?', seems realistic.

---

2. The attorney testified that the wife resided in an apartment with a different number.

"Lee's testimony was suspect. How likely is it that she would independently remember whether defendant was a customer at the Laundromat on a particular night, months before the traverse hearing? Even if she did, her alibi testimony does not negate the possibility that [the attorney] did, in fact, serve the summons with notice on defendant while the latter admittedly had exited the Laundromat.

"[The wife's] testimony was not credible. She had a motive to deny being served with process. The most probative bit of evidence, [the wife's] ATM receipt, is inconclusive as an alibi, since, by her own admission, [the wife] could have walked to where [the attorney] claimed he served her and still have returned to the Laundromat at the time Lee testified [the wife] returned."

With regard to the wife's testimony, the Referee noted in particular: "On cross-examination, the [wife] testified that the distance between her bank and the corner of Prince and Wooster Streets is 3½ blocks. . . . [The wife] further testified, over objection, that the distance can be walked in ten minutes. [The Wife] testified that the time on the ATM receipt indicates that the time of her banking transaction was at 2135 . . . 9:35 P.M."

The motion court confirmed the report, finding that the findings were "supported by the record" and that "the husband obtained jurisdiction over the wife by serving her as indicated in the affidavit of service."

The burden of proof on the issue of jurisdiction rests with the party asserting it (*Lamarr v Klein*, 35 AD2d 248, 250 [1970], *affd* 30 NY2d 757 [1972]), and, after a hearing, must be established by a preponderance of the evidence (*Elm Mgt. Corp. v Sprung*, 33 AD3d 753 [2006]). "[T]he evidence must be of such weight as to produce a reasonable belief in the truth of the facts asserted" (*Jarrett v Madifari*, 67 AD2d 396, 404 [1979], quoting Fisch, New York Evidence § 1090 [2d ed]). If substantiated by the record, a referee's determination will not be disturbed (*Nager v Panadis*, 238 AD2d 135 [1997]; *see Marcus v Marcus*, 4 AD3d 257 [2004]).

At the outset of the hearing, the wife's attorney, noting that the husband's sole witness was an attorney, asked the Referee not to indulge in a "presumption based upon either the affidavit of service or the fact that the person who allegedly effected service is an attorney." This request was in keeping with the general rule in assessing a witness's credibility (*see* PJI3d 1:8, 1:41). Unfortunately, as his report shows, the Referee based his decision as to credibility essentially on the process server's status as an attorney. Although he stated that the attorney's testimony had a "ring of truthfulness" to it, the basis of that

conclusion is clear from the very next sentence: "Why would he, an attorney admitted to practice for over 30 years, risk his license by filing a perjurious affidavit of service?" While on the subject of rhetorical questions, one might ask, "Why would an attorney put himself in the position of acting as a process server for his client in a case such as this, given his relationship to the parties?" As to the wife's alleged response to the military service question—"Why are you asking that stupid question?"—its relevance to the attorney's credibility is unfathomable.

On the other hand, the Referee found the wife not credible because she had a motive to deny being served. This finding ignores the fact that the attorney also had an obvious interest—sustaining his claim of service and supporting his client's case. Furthermore, the Referee's reasoning is flawed in finding the ATM receipt "inconclusive as an alibi, since, by her own admission, [the wife] could have walked to where [the attorney] claimed he served her and still have returned to the Laundromat at the time Lee testified [the wife] returned." While this may be true, the Referee—ignoring the only piece of unassailable documentary evidence—offers no explanation as to why the wife would walk completely out of her way to the intersection of Prince and Wooster Streets (the alleged place of service, which was *two blocks south* of Bleecker Street) before returning to the laundromat, which was one street west of the ATM (both of which were *north* of Bleecker Street). In that regard, while both the Referee and the majority question Lee's credibility, particularly with respect to her recollection of the exact date and time in question, the Referee made no finding that the wife was not at the laundromat at that time. In any event, on cross-examination, Lee offered a plausible explanation for her specific recollection of the date and time.

Moreover, what reason would the wife have, if actually served, to ignore process? As she pointed out in argument, she had vigorously participated in those proceedings since their inception in Family Court in 2003 and had never defaulted. In fact, it was she who instituted the original divorce proceeding, which she discontinued only because of a lack of funds.

A judicial factfinder should make credibility determinations on the basis of demeanor, forthrightness in answering, consistency or lack thereof in the account being given, interest in the outcome and other relevant considerations. Status in life cannot be the decisive factor in a "he said/she said" credibility contest. "General propositions do not decide concrete cases" (*Lochner v New York*, 198 US 45, 76 [1905, Holmes, J., dissenting]). Since status was decisive in this case, it cannot be said that the

husband sustained his burden of proof that required—as to the challenged service—a preponderance of the evidence (*Jacobs v Zurich Ins. Co.*, 53 AD2d 524, 525 [1976]).

The majority vacates the wife's default because of her efforts to appear in and defend the action prior to the entry of the default judgment. In my view, such a result is untenable. In upholding the Referee's determination at the traverse hearing, the majority agrees with the Referee's conclusions that the wife was served with the summons and that her testimony was incredible, and also with his assessment of Lee's testimony as "suspect." In short, the majority implicitly finds that the wife not only perjured herself but suborned perjury as well. While courts may be inclined to a more liberal attitude in vacating defaults in matrimonial actions (*see e.g. O'Brien v O'Brien*, 149 AD2d 830 [1989), no court has ever been so indulgent as to reward a party who has engaged in such conduct by granting affirmative relief.

The majority's disposition is also unsupportable because, despite the tendency toward a liberal policy in matrimonial proceedings, "it is still incumbent upon a party seeking vacatur to establish both a reasonable excuse for the default and a meritorious defense" (*Estate of Allen v Allen*, 258 AD2d 423 [1999]). There is no showing of a meritorious defense, and to the extent that the wife's claim of lack of service—the only basis for her motion to vacate the default—can be considered an excuse, this claim has been patently rejected by the majority.

In my view, the majority's route to the result reached is as tortured as it is inexplicable.

Accordingly, I would deny plaintiff's motion to confirm the Referee's report, grant defendant's cross motion to disaffirm the report and her motion to vacate the default judgment, and dismiss the complaint.